# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Stanley T. Adams, | : | Case No. 4:06CV0150 |
| | : | |
| Petitioner | : | |
| | : | Judge Solomon Oliver, Jr. |
| v. | : | |
| | : | Magistrate Judge David S. Perelman |
| Marc Houk, Warden, | : | |
| | : | **REPORT AND RECOMMENDED** |
| | : | **DECISION** |
| Respondent | : | |

In this action in habeas corpus, 28 U.S.C. §2254, petitioner challenges the constitutionality of his November 8, 2000 convictions pursuant to a jury trial to one count of murder, upon which he is serving a sentence of fifteen years to life imprisonment, and one count of rape, upon which he was sentenced to ten years incarceration, to be served consecutively.[1]  Petitioner was also adjudicated to be a sexually oriented offender.

The facts in petitioner's criminal case were summarized by the state appellate court in pertinent part as follows:

> The essential facts presented in evidence at the trial are as follows: David Taylor ("David") and Roslyn Taylor ("Roslyn") were divorced and had an unconventional relationship.  Although they continued to live together, Roslyn was in the process of moving out. In addition, Tara Evans ("Tara") and Fahim Evans ("Fahim"), as

---

[1]Petitioner was also convicted in Trumbull County Common Pleas Court in Case No. 00CR700 of aggravated murder, aggravated burglary and rape, and was subsequently sentenced to death.  State v. Adams, 103 Ohio St.3d 508, 817 N.E.2d 29 (2004).

1

well as Tracy Justice ("Justice"), lived in David's home, located at 6301 Morningside Drive, Hubbard, Ohio.  David and Roslyn had problems with cocaine and alcohol.  Roslyn also had problems with Valium (a muscle relaxant).

On the night of August 4, 1999, at approximately 10:00 p.m., Roslyn and Justice, who were long time friends, went to the Motor Bar on Logan Avenue in Youngstown, Ohio.  David arrived at the bar and ordered Roslyn to return home.  Roslyn and Justice left the bar around 1:00 a.m. on August 5, 1999.  Because Roslyn's driving was so poor, due to her consumption of alcohol and Valium, Justice asked Roslyn to stop the vehicle, and Justice drove the rest of the distance to David's home.

About 2:00 a.m., appellant arrived at David's home with Millie Homa ("Millie") and John Gaia.  Roslyn and appellant began kissing and fondling one another.  Justice heard Roslyn say that she thought appellant was cute and that she was thinking about having sex with him.  Roslyn later told Justice that she planned to engage in sex with appellant on David's bed.

At approximately 2:30 a.m., David returned home.  A verbal argument ensued between David and Roslyn, which escalated into a physical encounter. Justice stated that David and Roslyn pushed each other, and Roslyn threw objects at David.  David became very angry and punched and kicked a door, causing it to fall from its hinges and resulting in David's wrist and/or hand breaking.  David and Roslyn also fought over drugs, which led to an encounter where David and Roslyn pushed each other back and forth, causing Roslyn's head to hit a cupboard.

David left the house immediately.  Roslyn and appellant left the house together approximately five minutes later, around 2:30 a.m., but in separate vehicles.  David returned to his house about fifteen minutes later, moaning and groaning in pain from his wrist/hand injury.  Around 3:50 a.m., Tara fixed David something to eat. When David was unable to take the pain any longer, Fahim drove him to the hospital at 5:30 a.m. and returned home around 7:00 a.m.

On August 6, 1999, Roslyn's body was discovered by police after a resident reported the vehicle as suspicious.  Roslyn's vehicle was found at the end of Oakmont Drive in Hubbard Township, Trumbull County, Ohio.  The car had severe smoke and fire damage, its windows were covered with soot, and it was positioned with one

2

wheel over a railroad track.  A fire of undetermined origin had ignited behind the driver's seat of the car.  Roslyn's body was found on the vehicle's passenger side, lying on her right side, facing the rear of the vehicle.  Roslyn's blue jean shorts were pulled down to her knees and her tank top was up below her breasts.

Dr. Humphrey D. Germaniuk ("Dr. Germaniuk"), medical examiner for Trumbull County, performed an autopsy on Roslyn and found a wound on her upper right forehead, swelling on her lower right to her mid forehead, and bruising on her abdomen, right arm, and tongue.  Bruising was also spotted on Roslyn's hip, which was likely caused by Roslyn being dropped or pushed into the vehicle.  Dr. Germaniuk also documented defensive wounds to the back of Roslyn's hands, a blackened left eye, and a fractured hyoid bone.  Dr. Germaniuk found petechiae, which in a situation like this, may be indicative of some type of asphyxia, choking, or strangulation.  Dr. Germaniuk opined that all of the injuries occurred in less than thirty minutes, perhaps only minutes before Roslyn's death.

A toxicology report revealed that Roslyn had a blood alcohol level of .268, nearly two and one-half times over the legal limit to drive a vehicle in Ohio, as well as a therapeutic level of Valium in her system.  Dr. Germaniuk also performed a sexual assault kit on Roslyn.  Although he could conclude that Roslyn had engaged in sexual activity, Dr. Germaniuk could not pinpoint a specific time that she had sex.  Dr. Germaniuk found no evidence of trauma to the anal or vaginal areas of Roslyn's body.  Also, as part of his examination, Dr. Germaniuk took fingernail scrapings from Roslyn's body, sealed them in an envelope, and submitted them to the Ohio Bureau of Criminal Identification and Investigation ("BCI").  Dr. Germaniuk listed the cause of Roslyn's death as acute carbon monoxide intoxication and estimated the time of death between 6:00 a.m. to 6:30 p.m. on August 5, 1999.

Because appellant was the last person known to have seen Roslyn alive, Hubbard Township Police Officer Joyce Coleman ("Officer Coleman") interviewed appellant on August 9, 1999.  Officer Coleman and Detective McBride encountered appellant in the Warren Municipal Court.  Detective McBride read a *Miranda* rights form to appellant, who initialed and signed the form appellant acknowledged that he saw Roslyn at David's home, claimed that he had no physical contact with her, then stated that he and Roslyn may have hugged.  During the interview, Officer Coleman noticed an egg-shaped burn mark on appellant's left forearm.

3

On October 20, 1999, Warren City Police Detective Emanuel Nites interviewed appellant. Fn 1 Appellant claimed that he was not with

_____

fn 1 Appellant was simultaneously under investigation by the Warren City Police Department for the murders of two Warren residents, Esther Cook and her twelve-year-old daughter, Ashley Cook.  Appellant was ultimately arrested, indicted, and convicted of these two killings.  His capital appeal for the Cook murders is presently pending before the Ohio Supreme Court in Case No. 01-2072.

_____

Roslyn and had no idea how her vehicle caught on fire.  Appellant specifically denied having sex with Roslyn.

Two individuals from BCI testified at trial.  Cynthia Shannon ("Shannon"), a forensic scientist, stated that she detected sperm in a rectal smear from Roslyn's body.  This sample was submitted to Jennifer Duval ("Duval"), a DNA serologist, who compared the sperm sample to a blood, hair, and saliva sample from appellant. Duval concluded that the sample from Roslyn's body matched appellant's DNA by a statistical probability of one in over four and one-half billion.  The fingernail scrapings, as well as a bloody ring taken from Roslyn's finger, were not tested by BCI.  According to Shannon, because evidence of semen had been found, it was the policy of BCI that further testing stop.

Christina Homa ("Christina"), the incarcerated eighteen-year-old daughter of Millie Homa ("Millie"), testified for the defense. Christina described various incidents in which she had encounters with David.  In either October or November of 1999, Christina contended that she was "kidnapped" by Millie and David, who threw her into the backseat of a car.  Although Christina claimed that she escaped and related the incident to a police officer, no "kidnapping" was ever reported.  Christina further held that during this incident with Millie and David, Christina fractured her ribs and went to the hospital.  However, no medical records were produced to corroborate that Christina received medical treatment.

In September or October of 2000, approximately one year after Roslyn's death, Christina stated that in another incident, David bragged about choking Roslyn.  Christina also claimed that David mounted a knife as a souvenir of incidents with Roslyn. Christina further contended that prosecutors told her not to mention the

4

choking incident and the knife mounting. Also, on October 21, 2000, Christina had an interview with Sue Stinedurf ("Stinedurf"), an investigator with the Trumbull County Prosecutor's Office. Christina told Stinedurf that both appellant and David wanted to mount a knife to memorialize cuts to Roslyn's feet.

Petitioner appealed his conviction to the Ohio Eleventh District Court of Appeals, alleging the following four assignments of error:

1    The trial court abused its discretion by denying appellant's motion for a new trial based upon prosecutorial misconduct.

2.   The trial court abused its discretion by failing to grant a new trial based upon prosecutorial misconduct resulting in the denial of appellant's rights to a fair trial and due process of law pursuant to the Sixth and Fourteenth Amendments.

3.   Appellant's convictions for rape and murder are not supported by sufficient evidence.

4.   Appellant's conviction for rape is against the manifest weight of the evidence.

On June 30, 2004 the appellate court affirmed the judgment of conviction.

Petitioner appealed the appellate court ruling to the Ohio Supreme Court alleging the following four propositions of law:

**Proposition of Law No. I:** A trial court abuses its discretion when it fails to grant a motion for a new trial where the record reveals that: (1) defense counsel objected throughout the trial to numerous discovery violations; (2) the trial court is forced to order after trial has begun, the prosecution to turn over discovery that had been requested long before trial; (3) such discovery is turned over after either voir dire or the trial has begun, thus allowing defense counsel little, if any opportunity to examine and prepare for such, and (4) the trial court finds the allegations of discovery violations sufficiently credible to order that the prosecution's file be sealed for availability of appellate review.

**Proposition of Law No. II:** A trial court abuses its discretion when it fails to grant a motion for a new trial where the record reveals that

5

the prosecution: (1) withholds discoverable materials it is required to provide to a defendant until the eve of trial, rendering defense counsel unable to fully prepare for trial and (2) promises its potential witnesses leniency in unrelated case if they testify against the defendant but do not testify as to their knowledge of certain facts which would exculpate the defendant.

**Proposition of Law No. III:** A criminal defendant's conviction for rape is not supported by sufficient evidence when the record reveals that: (1) the alleged victim of the rape dies without having had the opportunity to make any statements regarding the alleged rape; (2) no evidence of sexual (i.e. vaginal or anal) trauma is found in the alleged victim; (3) the alleged victim had expressed her desire to engage in sex with the defendant the last time that the alleged victim was seen; and (4) an expert testifies that the alleged victim may have engaged in sexual activity well prior to the events which would cause her death.

**Proposition of Law No. IV:** A criminal defendant's conviction for murder is not supported by sufficient evidence when the record reveals that: (1) an expert testifies that the proximate cause of the death of the alleged victim is acute carbon monoxide inhalation; (2) the underlying felony of violence supporting the murder charge is rape; and (3) there is no evidence that appellant started or had reason to know of the fire which produced the carbon monoxide that caused the alleged victim's death.

On November 10, 2004 the supreme court denied petitioner leave to appeal and dismissed the appeal as not involving any substantial constitutional question.

While that appeal was pending in the state supreme court, on September 17, 2001 petitioner filed a motion to vacate conviction and set aside sentence in which he argued the following sole claim of error:

1. Petitioner's conviction is voidable because he was denied the effective assistance of trial counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

The trial court dismissed that motion on March 20, 2002.

6

Petitioner appealed that ruling to the Ohio Eleventh District Court of Appeals, but that appeal was dismissed on December 23, 2002 as a consequence of petitioner's failure to file a proper appellate brief.  Petitioner did not appeal that ruling to the state supreme court.

On February 3, 2006 the petitioner filed the instant petition, in which he raises the following four claims for relief:

      A.     **GROUND ONE:** Petitioner was denied his due process right to a fair trial when the State withheld material, exculpatory evidence in a criminal prosecution.

            **Supporting FACTS:** Defense counsel, throughout the trial, objected to numerous discovery violations.  The State submitted several key items of discovery so late that defense counsel did not have the opportunity to assess their importance or investigate.  Exculpatory items were among voluminous stacks of files made available by the State for viewing, but not copying just prior to voir dire, during voir dire, or during the first week of trial.

      B.     **GROUND TWO:** Petitioner was denied his due process right to a fair trial when the State promised potential witnesses leniency in unrelated cases if the witnesses testified against petitioner and did not testify as to their knowledge of certain facts which might exculpate defendant.

            **Supporting FACTS:** Christine Homa testified that, while she was in jail, an assistant county prosecutor came to visit her and asked her not to talk about an incident where David Taylor told Homa how he had choked Roslyn Taylor (the victim) until she changed colors.  Homa was also told by agents of the State not to mention David Taylor's discussion of a hunting knife that he had mounted on his wall as a souvenir from "incidents regarding Roslyn."

      C.     **GROUND THREE:** Petitioner's conviction of rape is not supported by sufficient evidence.

            **Supporting FACTS:** The decedent died without making a statement regarding the alleged rape.  Examination of the body of the decedent revealed no evidence of sexual trauma.  The decedent had expressed a desire to engage in sexual conduct with Petitioner.  An expert testified that the decedent may have engaged in sexual

conduct well prior to the events which caused her death.

    **D.**    **GROUND FOUR:** Petitioner's conviction of murder is not supported by sufficient evidence.

        **Supporting FACTS:** An expert testified that the proximate cause of death was acute carbon monoxide inhalation.  There was no evidence that Petitioner started or had reason to know of the fire that produced the carbon monoxide.

The provisions of the Antiterrorism and Effective Death Penalty Act, "AEDPA," Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 26, 1996) are controlling herein as the instant petition was filed after the Act's effective date.  Lindh v. Murphy, 521 U.S. 320 (1997).[2]

Respondent argues that petitioner's first and second claims for relief have been procedurally defaulted in light of the fact that they were not presented to the state courts as independent federal constitutional claims, but, rather, were articulated as rationale for his first and second assignments of error in which he argued that the trial court abused its discretion in denying his motion for a new trial.

The exhaustion doctrine requires that before filing a petition in federal habeas corpus a defendant must utilize all available state remedies, through a motion or petition for review by the state's highest court, by which he/she may seek relief based upon an alleged violation of constitutional rights.  Granberry v. Greer, 481 U.S. 129, 133 (1987).  Under the exhaustion doctrine, "A petitioner must 'fairly present' the substance of each of his federal constitutional claims to the state courts before the federal courts will address them." Hannah v. Conley, 49 F.3d 1193, 1196 (6th Cir. 1995).  Fair presentation of a federal constitutional issue to the state's highest court must be in the form of a federal constitutional question, either by direct citation to federal

---

[2]There are no issues of untimeliness in this case.

cases employing constitutional analysis or to state cases relying on constitutional analysis in similar fact patterns.  Id.  It is not enough to present the facts giving rise to the federal claim raised in habeas corpus;  a petitioner must present the same legal theory to the state courts as is presented to the federal courts in order to preserve the claim.  Wong v. Money, 142 F.3d 313, 322 (6th Cir. 1998).  Even if a claim is related, but distinct, the claim is nonetheless defaulted.  Lott v. Coyle, 261 F.3d 594, 607, 619 (6th Cir.  2001).  Failure to fairly present an issue to the state courts results in waiver of that claim, and in order to gain access to habeas review of a waived claim a petitioner must demonstrate cause to excuse the waiver and actual prejudice to his/her defense.  Coleman v. Thompson, 501 U.S. 722, 750-51 (1991).

Although petitioner argued before the state appellate court that the trial court erred by not granting a motion for new trial in light of evidence of prosecutorial misconduct, which does not exactly mirror the claims of violation of constitutional rights by reason of prosecutorial misconduct articulated in his first two claims for relief in this proceeding, he did nonetheless articulate a claim of prosecutorial misconduct by reason of failure to produce exculpatory evidence and cited cases employing constitutional analysis and/or state cases  relying on constitutional analysis in similar fact patterns.  That being so, it is this Court's opinion that these claims for relief were not procedurally defaulted.

Procedural default aside, this Court finds each of the claims for relief to be without merit.

The role of a federal district court in habeas corpus is set forth in Title 28 U.S.C. § 2254 (d) which provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the

claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States Supreme Court has held that the clauses "contrary to" and "unreasonable application of" as found in §2254(d)(1) have independent meanings. Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495 (2000). A state court adjudication is deemed as being "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the Supreme Court]." A state court adjudication is deemed as involving an "unreasonable application of clearly established Federal law, as determined by the Supreme Court...as of the time of the relevant state-court decision;" "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principal from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principal to a new context where it should apply." 120 S.Ct. at 1519-1520. In deciphering the "unreasonable application" clause this Court must inquire as to whether "the state court's application of clearly established federal law was objectively unreasonable." Id. at 1521.

The Sixth Circuit Court of Appeals has interpreted the foregoing as holding that even if a federal habeas corpus court determines that a state court incorrectly applied federal law it may not

grant relief in habeas corpus unless it finds that the state court ruling was also unreasonable. Simpson v. Jones, 238 F.3d 399, 405 (6th Cir. 2000), citing Machacek v. Hofbauer, 213 F.3d 947, 953 (6th Cir. 2000), cert. denied, 121 S.Ct. 808 (2001).

In petitioner's first claim for relief he alleges prosecutorial misconduct by reason of the failure to produce exculpatory evidence.

The controlling rule on the issue of alleged improper conduct by the prosecutor is that in order to warrant relief in habeas corpus a prosecutor's misconduct must have been such that it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. De Christoforo, 416 U.S. 637, 643 (1974); Caldwell v. Russell, 181 F.3d 731 (6th Cir. 1999).

> On habeas review, the standard to be applied to claims of prosecutorial misconduct is whether the conduct was 'so egregious so as to render the entire trial fundamentally unfair' . . . This court must decide whether the prosecutor's statement likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt.

Pritchett v. Pitcher, 117 F.3d 959, 964 (6th Cir. 1997)(Citation omitted).

In a habeas corpus context, application of the foregoing is altered by the requirement that this Court defer to the findings of the state courts on petitioner's claims of prosecutorial misconduct.  Bowling v. Parker, 344 F.3d 487, 512 (6th Cir. 2003), citing Macias v. Makowski, 291 F.3d 447, 453-54 (6th Cir. 2002) ("If this court were hearing the case on direct appeal, we might have concluded that the prosecutor's comments violated Macias's due process rights.  But this case is before us on a petition for a writ of habeas corpus.  So the relevant question is not whether the state court's decision was wrong, but whether it was an unreasonable application of clearly established federal law.")  Habeas relief may only be granted on this claim if the state

court's decision that the conduct of the prosecuting attorney was not unconstitutional constituted an unreasonable application of clearly established federal law.

The rule of Brady v. Maryland, 373 U.S. 83, 87 (1963), obligates the government "to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." Coe v. Bell, 161 F.3d 320, 343 (6th Cir. 1998), cert. denied, 528 U.S. 842 (1999). Suppression of such evidence by the prosecution upon request violates due process irrespective of the good faith or bad faith of the prosecution. Brady, 373 U.S. at 87. Defendants must not be obligated to "scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed." Banks v. Dretke, 540 U.S. 668, 695 (2004).

In order to establish a claim for relief based upon the failure to produce exculpatory evidence a petitioner must establish that the prosecution "suppressed evidence; that such evidence was favorable to the defense; and that the suppressed evidence was material." Carter v. Bell, 218 F.3d 581, 601 (6th Cir. 2000) (citing Moore v. Illinois, 408 U.S. 786, 794-795 (1972)). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985). The materiality requirement was clarified in Kyles v. Whitley, 514 U.S. 419, 434 (1995), wherein the court held in pertinent part:

> *Bagley's* touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

12

Thus, in a successful <u>Brady</u> claim, "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-282 (1999).  It follows that the <u>Brady</u> rule does not apply where the evidence in question is available to the defense from sources other than the state and the defense is aware of the facts necessary to lead to that evidence.   <u>Coe v. Bell</u>, <u>supra</u> at 344;  <u>Spirko v. Mitchell</u>, 368 F.3d 603 (6th Cir. 2004), <u>cert. denied</u>, ___U.S.___, 2005 U.S. LEXIS 2799 (2005).

The state appellate court rejected petitioner's claims of constitutional violation by reason of failure to produce exculpatory evidence, holding in pertinent part:

> In his first assignment of error, appellant argues that the trial court abused its discretion by failing to grant a motion for a new trial based upon prosecutorial misconduct where the record reveals that defense counsel objected throughout the trial to numerous discovery violations.  According to appellant, after trial had begun, the trial court was forced to order the prosecution to turn over discovery that had been requested long before trial, and the trial court found the allegations of discovery violations sufficiently credible to order that the prosecution's file be sealed for availability of appellate review.

> A motion for a new trial is governed by Crim.R. 33, which states in pertinent part:

> "(A) Grounds

> "A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

> "(1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;

> "(2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;

> "(3) Accident or surprise which ordinary prudence could not have

13

guarded against ***."

As the court stated in *State v. Schiebel* (1990), 55 Ohio St.3d 71, 564 N.E.2d 54, paragraph one of the syllabus, "[a] motion for new trial pursuant to Crim.R. 33(B) is addressed to the sound discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion." *See, also, State v. Nahhas* (Mar. 16, 2001), 11th Dist. No. 99-T-0179, 2001 Ohio App. LEXIS 1236, at *8. "No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court *** unless it affirmatively appears from the record that the defendant was prejudiced thereby or was prevented from having a fair trial." Crim.R. 33(E)(5). "The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial." *State v. Fears* (1999), 86 Ohio St.3d 329, 332, 1999 Ohio 111, 715 N.E.2d 136, citing *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394.

A trial court need not conduct an in camera inspection of the prosecutor's file or order the file to be sealed for appellate review any time the appellant so requests. *State v. Alexander* (Nov. 29, 1996), 11th Dist. No. 93-T-4948, 1996 Ohio App. LEXIS 5418, *11. An in camera inspection is not required when an appellant makes a general request for Brady material. *State v. Lawson* (1992), 64 Ohio St.3d 336, 344, 1992 Ohio 47, 595 N.E.2d 902. Thus, there is also no requirement that the prosecutor's file be sealed for appellate review simply because an appellant makes general discovery request for exculpatory material. *Alexander* at *13.

In the case at bar, prior to trial, appellant filed numerous motions seeking to insure that the state complied with the discovery requirements of *Brady v. Maryland* (1963), 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194. In particular, on March 30, 2000, appellant filed a motion for an order directing that a complete copy of the prosecutor's file be made and turned over to the court for review and be sealed for appellate review, if necessary. This motion was ultimately granted, even though appellant's request was general in that it directed that a complete copy of the prosecutor's whole file, rather than something specific within the file, be sealed for appellate review. *See Pennsylvania v. Ritchie* (1987), 480 U.S. 39, 46, 94 L.Ed.2d 40, 107 S.Ct. 989.

Nevertheless, in the interest of justice, this court complied with the trial court's request and reviewed the prosecutor's sealed file. After

oral arguments, we permitted both appellant's counsel and an assistant prosecutor to review the file.  Subsequently, appellant's counsel contended that three documents had not been provided to appellant prior to trial.  This court then allowed both sides to submit supplemental briefing.  According to appellant, the three documents contain two important pieces of information.  Appellant argues that the documents show that two days after the murder, David was seen burning a blue blanket in a fire behind his house.  Also, appellant asserts that the documents provide that Christina made a second statement to the police which further implicated David in the murder.  Thus, appellant contends that if these two pieces of information had been presented to the jury, the outcome of the trial would have been different.  We disagree.

In the instant matter, pursuant to the prosecutor's sealed file, as well as based on the record of the trial court, there is no evidence or testimony which connects David's blue blanket to the crime at issue.  Under such circumstances, the state simply would have had no duty to reveal this information because it was not exculpatory in nature.

In regard to the police officer's summary of Christina's statement, this court would first note that, in addition to the officer's statement, the prosecutor's sealed file also contained transcripts of other interviews Christina gave to the police.  Our review of the two transcripts shows that the statements Christina made during the interviews were virtually identical to the statements attributed to her in the police officer's summary.  Furthermore, in reviewing the prosecutor's sealed file after oral arguments before us appellant's trial counsel never stated that he had been denied access to the two transcripts.  Thus, even if the state did fail to provide discovery of the summary, appellant could not have been prejudiced because his trial counsel was already aware of the information contained in the summary.

Second, as to appellant's contention that the police officer's summary further implicated David in the murder, this court would indicate that the statements made in the summary and the two interview transcripts were somewhat inconsistent with the testimony Christina gave at trial.  In the summary and the transcripts, Christina stated that she had overheard David telling other people about choking the victim and cutting her feet with a knife.  In contrast, Christina testified at trial that she had had a direct conversation with David on the matter.  Based upon this,

15

appellant now argues that the information in the police officer's summary shows that Christina actually had two separate conversations with David in which he implicated himself.

However, the trial transcript readily shows that the state fully cross-examined Christina concerning the inconsistencies between her direct testimony and her prior statements to the police. Our review of Christina's responses to the state's questions establishes that she was referring to the same basic incident to which she had cited in the prior statements; i.e., Christina never stated that her direct testimony concerned a separate incident than to what she had referred in speaking to the police. Taken as a whole, her testimony showed that she merely gave a slightly different version of the same incident.

In addition, this court would emphasize that the statements Christina attributed to David during her trial testimony were virtually identical to those she attributed to him in the summary and the interview transcripts. Therefore, notwithstanding the discrepancies concerning the manner in which David conveyed his statements during the single incident, it is apparent that the jury heard all relevant testimony Christina could give as to whether David had been involved in the murder.

In light of the foregoing, we hold that appellant has failed to demonstrate that the prosecutor's sealed file had any previously undisclosed documents containing new exculpatory evidence which appellant could have used in his defense. Even assuming arguendo that the state did fail to provide proper discovery of the three documents cited by appellant, the error was not prejudicial because it would not have changed the outcome of the trial.

"Exculpatory evidence" is defined as evidence favorable to the accused, which "if disclosed and used effectively, *** may make the difference between conviction and acquittal." *U.S. v. Bagley* (1985), 473 U.S. 667, 676, 87 L.Ed.2d 481, 105 S.Ct. 3375. Appellant did not articulate to the trial court, nor does he reveal to this court, exactly what material evidence was contained in the various witness statements which may have made the difference between conviction and acquittal. *See State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus.

Appellant's contention of a discovery violation in his original brief involved appellee's witness, Matthew Balut ("Balut"), a lieutenant

16

from Champion Fire Department, who submitted inconsistent testimony which differed in part from his report. The discovery provided to appellant by way of Balut's opinion stated that the fire, which consumed Roslyn's vehicle, had an "undetermined origin." On cross-examination, Balut continued to hold that he could not state with certainty the source or cause of the fire. On redirect, the prosecutor had again elicited testimony that the fire could be "anything from a discarded cigarette to somebody using a lighter to set the fire." However, the trial court struck the redirect testimony and informed the jury to disregard it and not consider it for any purpose. Here, Balut's testimony varied from that rendered by him in his direct testimony and from that submitted in his cross-examination. Appellant was provided a report and had a right to examine the witness on the finding of that report.

Assuming arguendo that the prosecutor's actions were improper, we conclude that they did not prejudicially affect the substantial rights of appellant. In particular, the trial court cured any error by striking Balut's answers on redirect examination, as well as by dismissing the aggravated arson charge outright. Furthermore, no exculpatory evidence was discovered in the prosecutor's sealed file which would have changed the outcome of this case. Thus, Appellant's first assignment of error is without merit.

This Court is of the opinion that the foregoing state appellate court rulings that the conduct of the prosecution was not improper and failed to rise to the level of a constitutional violation, did not constitute an unreasonable application of clearly established federal law. That is particularly true in this case as the state appellate court provided the defense with the entire contents of the sealed prosecution file, after which petitioner's counsel only identified three documents containing what the defense claimed to have been two important pieces of information which could have changed the outcome of the trial, a notion the appellate court rejected in light of the fact that the information was not pertinent and/or was otherwise available to the defense. It follows that petitioner's first claim for relief must fail upon merits review.

Petitioner's second claim for relief is also premised upon alleged prosecutorial misconduct,

17

but this time by reason of failure to disclose a promise purportedly made by the prosecution to witnesses that they would be granted leniency in unrelated cases if they testified on behalf of the prosecution in petitioner's case.

The state appellate court also rejected this claim of prosecutorial misconduct, holding in pertinent part:

> In his second assignment of error, appellant argues that the trial court abused its discretion by failing to grant a new trial based upon prosecutorial misconduct resulting in the denial of appellant's rights to a fair trial and due process of law pursuant to the Sixth and Fourteenth Amendments.  Appellant specifically contends that the prosecutor withheld discoverable materials, as well as promised its potential witnesses leniency in unrelated cases if they testified against appellant, rather than testifying as to their knowledge of certain facts which would exculpate the defendant.

> The Sixth Amendment of the United States Constitution, made applicable to the state through the Fourteenth Amendment, states in pertinent part that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed ***."  Section One, of the Fourteenth Amendment, specifically states that '***nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

> In the case at bar, with respect to the discovery issue, appellant again argues that it is the duty of this court to comply with his general request to find possible discovery violations in the prosecutor's sealed file worthy of an order for a new trial. Consistent with our analysis in the first assignment of error, because appellant's request was general and based on *Alexander* and *Lawson*, supra, the trial court was not required to have the prosecutor's file sealed for appellate review.  Again, this court complied with the trial court's request to review the sealed file but found no apparent discovery violations.

> Appellant also alleges that appellee engaged in "witness tampering" with respect to Christina, and argues that pursuant to Crim.R. 33(A)(2), a new trial should be granted.  Christina testified that the

18

assistant prosecutor, Sarah Kovoor ("Kovoor"), and Stinedurf, told her not to mention an incident where David told Christina about how he choked Roslyn.  Christina also alleged that Kovoor and Stinedurf told her to keep quiet with respect to David mounting a knife as a souvenir to represent incidents with Roslyn.  However, Stinedurf denied the contentions made by Christina.  Stinedurf testified that she did not order Christina not to talk to anyone else, but rather told her to be truthful.  Stinedurf also stated at trial that she never told Christina to leave out part of her story or to conceal any comments David may have made.

"On the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts."  *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.  "A reviewing court may not reverse a judgment of conviction in a criminal case in a trial court, where the record shows that a verdict of guilty was returned by a jury on sufficient evidence and where no prejudicial error occurred in the actual trial of the case or in the instructions given the jury by the court."  *Id*. at paragraph two of the syllabus.

In the instant case, Christina's favorable stories concerning appellant and the incriminating comments dealing with David were presented to the jury.  Based on *DeHass*, supra, it was the jury's duty to determine the credibility of the witnesses.  It appears the jury gave more weight and found Stinedurf's testimony more credible than Christina's.  As such, based on the record and the evidence presented, the factfinders' conclusions did not deprive appellant of his right to a fair trial and due process of law.  Therefore, appellant is not entitled to a new trial pursuant to Crim.R. 33.  Thus, appellant's second assignment of error is without merit.

As was the case previously, this Court finds that the state appellate court rulings that the conduct of the prosecution was not improper and failed to rise to the level of a constitutional violation did not constitute an unreasonable application of clearly established federal law.  The allegations of wrongdoing, as well as the prosecutions' denials, were presented to, and rejected by, the jury.  In light of the foregoing, petitioner's second claim for relief is without merit.

Petitioner argues in his third and fourth claims for relief that there was constitutionally

19

insufficient evidence to support his convictions.

The standard for addressing an argument that a conviction is not supported by sufficient evidence was enunciated in Jackson v. Virginia, 443 U.S. 307, 319 (1979), as follows: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Accord, McKenzie v. Smith, 326 F.3d 721, 727 (6th Cir. 2003); Matthews v. Abramajtys, 319 F.3d 780, 788 (6th Cir. 2003).  In reaching its determination as to the sufficiency of the evidence this Court may not substitute its determination of guilt for that of the factfinder and may not weigh the credibility of the witnesses.  Herrera v. Collins, 506 U.S. 390, 401-402 (1993);  Jackson v. Virginia, 443 U.S. at 319, n.13; Brown v. Davis, 752 F.2d 1142 (6th Cir. 1985).

That standard has been modified somewhat by §2254(d) in that questions of sufficiency of the evidence are mixed questions of law and fact upon which a writ may be granted only if the adjudication of the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," §2254(d)(1), or was based upon "an unreasonable determination of the facts in light of the evidence presented" at petitioner's trial, §2254(d)(2).  Starr v. Mitchell, unreported, Case No. 98-4541, 2000 U.S.App. LEXIS 25646,*9-*10 (6th Cir. October 6, 2000).

The state appellate court reviewed petitioner's claims that he was convicted without sufficient proof and held in pertinent part as follows:

> In his third assignment of error, appellant argues that his convictions for rape and murder are not supported by sufficient evidence.
>
> As this court stated in *State v. Schlee* (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at *13:

"' Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while 'manifest weight' contests the believability of the evidence presented.

""(***)The test (for sufficiency of the evidence) is whether after viewing the probative evidence and the inferences drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. *The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence.***'*"

"In other words, the standard to be applied on a question concerning sufficiency is: when viewing the evidence 'in a light most favorable to the prosecution,' *** '(a) reviewing court (should) not reverse a jury verdict where there is substantial evidence which the jury could reasonably conclude that all of the elements of an offense have been proven beyond a reasonable doubt.'***" (Emphasis sic.) (Citations omitted.)

"***[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 273; *Jackson v. Virginia* (1979), 443 U.S. 307, 319.  Further, the verdict will not be disturbed on appeal unless the reviewing court finds that reasonable minds could not have arrived at the conclusion reached by the trier of fact.  *State v. Dennis* (1997), 79 Ohio St.3d 421, 430.

Appellant's first question presented for review and argument deals with whether appellant's conviction for rape is supported by sufficient evidence when the record reveals that the alleged victim

21

of the rape died without having had the opportunity to make any statements regarding the alleged rape, no evidence of sexual trauma was found on the alleged victim, the alleged victim had expressed her desire to engage in consensual sex with appellant the last time she was seen, and an expert testified that the alleged victim may have engaged in sexual activity prior to the events which caused her death.

R.C. 2907.02 states in pertinent part:

> "(A)(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force;
>
> "(B) Whoever violates this section is guilty of rape***."

In the case at bar, the jury found appellant guilty of rape, pursuant to R.C. 2907.02.  As indicated in the foregoing facts, an autopsy, performed on Roslyn's body by Dr. Germaniuk, revealed defensive wounds, swelling, bruising, a blackened left eye, a fractured hyoid bone, and petechiae.  Dr. Germaniuk performed a sexual assault kit on Roslyn and concluded that she had engaged in sexual activity, but could not pinpoint a specific time that she had sex.  Also, Dr. Germaniuk found no evidence of trauma to the anal or vaginal areas of Roslyn's body.  However, forensic scientist Shannon detected sperm in a rectal smear and submitted it to Duval for testing.  Duval compared the sperm sample from Roslyn's body to a blood, hair, and saliva sample obtained from appellant, which matched appellant's DNA.

Appellant argues that he never engaged in anal sexual activity, despite the fact that his sperm was found in Roslyn's anal cavity. Appellant offered no other explanation as to how his sperm would find its way into Roslyn's rectum other than through the sexual conduct of anal intercourse.  See *State v. Harris*, 2d Dist. No. 19311, 2003-Ohio-1046, at ¶11. Even appellant's counsel conceded that appellant had engaged in sexual contact with Roslyn and that the DNA located in Roslyn's anal cavity, matched appellant. However, appellant's counsel stressed that there was no evidence to prove that appellant did anything outside of having sex with Roslyn.  We disagree.

22

In *State v. Carter* (2000), 89 Ohio St.3d 593, the Supreme Court of Ohio found sufficient evidence to support a rape conviction, where the defendant denied having sexual conduct with the decedent, even though the defendant's semen was discovered in the decedent's rectum.  The court stated that the "[defendant] argues that there was no 'sexual conduct,' i.e., penetration, to the anus of the victim. Instead, [the defendant] presented a theory at trial that the semen was deposited on the outside of the body and seeped into the anus. The evidence in the record strongly supported the state's theory that [the defendant's] sperm, found in the victim's anus and positively identified through DNA testing, was placed there through the insertion of [the defendant's] penis into the victim's anus.  The evidence did not support an acquittal on the charge of rape."  Id. at 601.

In the instant matter, appellant was the last person seen with Roslyn on the night in question.  Roslyn's body was found with physical injuries.  Dr. Germaniuk opined that all of Roslyn's injuries occurred in less than a half-hour, perhaps only minutes before her death.  When Roslyn's body was discovered, her shorts were pulled down to her knees and her tank top was up below her breasts. Sperm was found in Roslyn's anal cavity which matched appellant's DNA by a statistical probability of one in over four and one-half billion.  Therefore, based on these facts, as well as *Harris* and *Carter*, supra, there was sufficient evidence to prove the element of sexual conduct.

Appellant next argues that appellee failed to prove the element of force or threat of force, pursuant to R.C. 2907.02(A)(2).  Again, however, due to the condition of Roslyn's clothing, as well as the bodily injuries she sustained, the trier of fact could reasonably conclude that appellant used force to facilitate anal sex with her. Although Dr. Germaniuk found no evidence of trauma to the anal or vaginal areas of Roslyn's body, he testified that the combined effects of alcohol, Valium, trauma to the head, and strangulation, would cause the tone of the sphincter muscle to decrease, which may have contributed to the lack of physical damage to Roslyn's anus.  Dr. Germaniuk further stated that the absence of trauma to the genitalia does not preclude that force was involved in the sexual act.  The foregoing facts show that Roslyn could not have sustained such severe injuries during her brief confrontation with David. Justice even testified that when she saw Roslyn leave David's house for the last time, she noticed no visible injuries on her.   Thus, according to Dr. Germaniuk's and Justice's testimony, as well as

23

Roslyn's bodily injuries and state of undress, there was sufficient evidence to prove that force was used when the sexual conduct occurred pursuant to R.C. 2907.02(A)(2).

Appellant's second question presented for review and argument deals with whether his conviction for murder, pursuant to R.C. 2903.02(B), is supported by sufficient evidence. Appellant stresses that the record reveals that an expert testified that the immediate cause of the death of the alleged victim was acute carbon monoxide inhalation, the underlying felony of violence supporting the murder charge is rape, and there is no evidence that appellant started or had reason to know of the fire which produced the carbon monoxide that cause [sic] the alleged victim's death.

R.C. 2903.02(B) states in pertinent part that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree ***."

"'***[P]roximate result' bears a resemblance to the concept of 'proximate cause' in that (a) defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct. (***) here, that means that death reasonably could be anticipated by an ordinarily prudent person as likely to result under these or similar circumstances. (***)' (Citations omitted.)" *State v. Gibson* (June 27, 1997), 11th Dist. No. 95-P-0125, 1997 Ohio App. LEXIS 2898, at 12-13, quoting *State v. Losey* (1985), 23 Ohio App.3d 93, 95.

In the case at bar, the trial court had sufficient evidence to determine that appellant caused the death of Roslyn as the proximate result of having committed rape, a felony of the first degree, pursuant to R.C. 2903.02(B). According to the foregoing facts, appellant beat and strangled Roslyn, leaving her in either an unconscious or comatose state. Dr. Germaniuk testified that he found petechiae, which in this type of situation, may be indicative of some type of asphyxia, choking, or strangulation. Based on *Gibson* and *Losey*, supra, an ordinarily prudent person could anticipate that death is a foreseeable consequence when a victim's neck is compressed to the point that his or her hyoid bone becomes fractured, which renders the victim incapacitated. Death is also a foreseeable consequence and could be reasonably anticipated by leaving a victim alone in an unconscious or comatose state without

24

any medical attention.

Appellant stresses that the immediate cause of Roslyn's death was carbon monoxide intoxication. Appellant argues that even if he did rape, beat, and leave Roslyn alone in the vehicle, he could not have foreseen that the vehicle would unexplainably burst into flames. According to appellant, the car fire was both an intervening force and entirely unforeseeable. We disagree.

Balut testified that although the cause of the fire was undetermined, it did not appear to be accidental. Also, Dr. Germaniuk repeatedly stated that Roslyn died of carbon monoxide intoxication because her injuries incapacitated her to the point where she could not extricate herself from the burning vehicle. Therefore, if Roslyn had not been raped, strangled, or beaten into a stupor in the first place, she most likely would have been able to get out of the burning vehicle alive.

The immediate cause of death, carbon monoxide intoxication, was a proximate result of the rape victim being left alone, incapacitated, and without medical attention. As such, an ordinarily prudent person could anticipate that death was a foreseeable consequence. See *Gibson* and *Losey*, supra. Therefore, the trial court's determination of guilt, pursuant to R.C. 2903.02(B), was proper. Thus, appellant's third assignment of error is without merit.

The state appellate court found the evidence sufficient to prove the elements of the crimes charged, relying primarily on the facts that the petitioner was the last person to see the victim alive, on the condition of her body, including the fact that sperm samples taken matched petitioner's DNA, her injuries indicated physical trauma, her state of undress, and the fact that although the immediate cause of death was found to have been carbon monoxide poisoning, that was found to have been the proximate result of the rape/beating victim having been left alone while unconscious and without medical attention. In so doing, the state appellate ruling, which relied overall on state authorities while it also applied the analysis set forth in Jackson v. Virginia, supra, neither resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

25

federal law, as determined by the United States Supreme Court, nor was the decision based upon an unreasonable determination of the facts in light of the evidence presented.  Petitioner does not convince this Court otherwise by challenging the jury's assessment of credibility of the witnesses.

In light of all the foregoing, it is recommended that the petition be dismissed without further proceedings.


                                                        s/DAVID S. PERELMAN
                                                        United States Magistrate Judge


DATE:   January 10, 2007



## OBJECTIONS

Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).